UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

```
_____
                               )
DANIEL FERRO,                  )
                               )
        Plaintiff,             )
                               )
    v.                         )   C.A. No. 11-348 S
                               )
STATE OF RHODE ISLAND DEPARTMENT )
OF TRANSPORTATION by and through )
its Director, Michael Lewis and )
JOSEPH GIGLIETTI and JOAN PARYANI, )
                               )
        Defendants.            )
_____)
```

## OPINION AND ORDER

WILLIAM E. SMITH, Chief Judge.

The resolution of this motion concerns the proper application of sex discrimination law where the harasser and alleged victim are members of the same sex. Before the Court is Defendants' motion for summary judgment (ECF No. 32). For the reasons set forth below, the motion is GRANTED.

I.   Background[1]

Plaintiff Daniel Ferro's ("Plaintiff" or "Ferro") 10 months of employment at the Rhode Island Department of Transportation

---

[1] The Court reviews the record in the light most favorable to the non-moving party, making all reasonable inferences in his favor. Mellen v. Trs. of Boston Univ., 504 F.3d 21, 24 (1st Cir. 2007). The facts are taken from portions of both parties' respective statements of undisputed facts. These facts are not in dispute unless expressly noted.

("DOT") were eventful.   Ferro began work as a DOT inspector on July 19, 2009, learning on his second day on the job that he was to report to the East Providence, Rhode Island field office the following day to begin a probationary period of employment. (DefendantS' Statement of Undisputed Facts ("Defs.' SUF") ¶¶ 2-4, ECF No. 32-2.)   Once at the field office, Ferro met Defendants Joseph Giglietti ("Giglietti") and Joan Paryani ("Paryani," and together with Giglietti and DOT, "Defendants"). (Id. at ¶ 5.)   Giglietti was tasked with training Ferro, while Paryani worked as his supervisor.   From the outset, Ferro and Giglietti clashed.   Throughout Ferro's employment Giglietti made comments to Ferro that were sexual in nature, boorish, and inappropriate for the workplace.[2]   (Plaintiff's Statement of Undisputed Facts ("Pl.'s SUF") ¶ 7, ECF No. 45.)   According to Plaintiff, some of these comments intimated a desire on Giglietti's behalf to engage in sexual conduct with Ferro, others inquired about Ferro's sex life with his wife, and still others were simply crass in nature.   (Id.)   In addition, Giglietti made comments to co-workers suggesting that Ferro had undergone a sex change operation and other comments implicating

---

[2] The particular language used by Giglietti is in dispute, though Defendants accept Ferro's version of events for the sake of this motion.   The Court does the same.   Specifically, Plaintiff claims that Giglietti persistently called him names such as "peckerhead" and "cocksucker" throughout his employment. (Deposition of Daniel Ferro ("Ferro Dep.") 31, ECF No. 48-2).

that Ferro was a homosexual who was engaged in a sexual relationship with the Governor of Rhode Island. (Id.; Deposition of Daniel Ferro ("Ferro Dep.") 31, ECF No. 48-2.) Giglietti also routinely directed lewd gestures at Ferro, such as sticking up his middle finger or making a masturbatory motion. (Ferro Dep. 33; 35.) Ferro did not take Giglietti seriously, and instead thought Giglietti was making churlish jokes. (Ferro Dep. at 42; 45; 47.)

Ferro describes two sexual advances by Giglietti, but again states that he did not take these advances seriously.[3] (Ferro Dep. at 42; 45.) In one, Giglietti and Ferro parked in a car during a break in the workday and Giglietti put his arm around Ferro, asked if Ferro wanted to kiss him, and stated he wanted to put his tongue in Ferro's mouth. (Ferro Dep. at 40-42.) In the second incident, Ferro and Giglietti were again in a state-owned truck, this time parked outside of Giglietti's home, when Ferro describes a "look" given to him by Giglietti, which Ferro understood to be an invitation to go into Giglietti's home and engage in sexual conduct. (Ferro Dep. at 42-45.)

While Giglietti's behavior, if it occurred, was clearly inappropriate, Ferro was no docile victim. In a probationary report assessing how Ferro was progressing with his work at the

---

[3] Defendants dispute that these alleged advances ever happened. The Court credits the Plaintiff's version of events for the purpose of this motion.

DOT, Ferro's supervisor suggested that Ferro "need[ed] to learn how to deal with fellow employees and the general public in a more professional manner." (Defs.' SUF at ¶¶ 7-8.) Ferro admits he routinely stuck his middle finger up at Giglietti. (Ferro Dep. at 33.) In addition, for Christmas, Ferro purchased a suggestive nightlight for Giglietti in the shape of a woman's leg.[4] (Ferro Dep. at 80.)

Several particular incidents involving Giglietti and Ferro shed light on the nature of the interaction between them. These events have no sexual undertones, but reflect a growing rivalry between the two men. In September 2009, Ferro and Giglietti got into an argument about Ferro cutting his nails in a DOT field office. (Ferro Dep. at 75-76.) The disagreement escalated until Giglietti left the premises to avoid further confrontation. (Aff. of Joseph Giglietti ("Giglietti Aff.") ¶ 9, ECF No. 34.) Following this incident, a new-found harmony appears to have set in among the particular crew to which Ferro and Giglietti were assigned. Indeed, Ferro received two positive reviews and passed his probationary period. Ferro took Giglietti and

---

[4] Ferro notes that co-workers harassing one another is "pretty typical treatment." (Ferro Dep. at 93.) Explaining what he meant, Ferro stated "[l]ike I've worked in shipyards, construction companies, machine shops. You know, there tends to be very vulgar language, treatment, comments. You know, I mean, shop talk, for instance, you know. I never pursued it -- a legal action because it was never to the extreme that Mr. Giglietti was." (Id. at 93.)

another man out to eat to thank them for their assistance in getting him through his probationary period. (Id. at ¶ 19.)

The harmony did not last long. On March 19, 2010, Ferro and a sub-contractor moved a billboard while doing work on a DOT project in Warren, Rhode Island. (Ferro Dep. 77-78.) At the end of the day, Giglietti asked Ferro to help him move the sign back to its original location. (Id.) Ferro first stated that he had a back issue, and then stated that he did not believe returning the sign to its original location was part of his job. (Id.) The two men again argued. (Giglietti Aff. ¶ 25.) Ferro was so loud during the argument that a DOT record keeper in a nearby office heard him and went outside to see what was happening. (Id.) A few days later, on March 24, 2010, Giglietti noticed that Ferro seemed hostile toward him. After Giglietti stated he was going to put gas in his truck, Ferro responded that Giglietti should pour gasoline on himself and light a match, but to be sure he did not damage the truck. (Ferro Dep. at 79.) Later that day, Ferro confronted Giglietti at his desk saying, among other things, that he was "tired of kissing [Giglietti's] ass because he was on probation." (Ferro Dep. 79.) That same day, Ferro brought a sign in the shape of an extended middle finger into the office and banged it on the table in the direction of Giglietti. (Ferro Dep. 34-35.)

A day later, Ferro sent an email that, according to Ferro, is central to the DOT's decision to terminate his employment. In that email to DOT supervisor John Pilkington, Ferro accuses Giglietti of having "issues with sex and always making insulting sexual remarks." (Defs.' SUF ¶ 23.)  He describes Paryani[5] as a "very arrogant person [who] constantly degrades me." (<u>Id.</u>)  He then questioned whether Giglietti and Paryani were actually doing work on the Warren project or instead were inappropriately pursuing hobbies or wasting away time. (<u>Id.</u>)  In response to this email, Pilkington launched an administrative investigation by contacting a human resources professional and scheduling a meeting with Ferro to discuss his accusations. (<u>Id.</u> at ¶¶ 27-28).  On April 9, 2010, that meeting occurred, where Ferro stated that Paryani "berated and belittled" him and said that Giglietti "continually makes inappropriate comments of a graphic nature which [Ferro] finds offensive." (<u>Id.</u>)  Ferro stated that these sexual jokes reflected poorly on the crew, and stated that some of the insults had been about his sexual orientation. (<u>Id.</u>)  At no time in his email, or during this meeting, did Ferro allege that Giglietti had made sexual advances toward him. (<u>Id.</u> at ¶ 25.)

---

[5] Ferro alleges only one instance of inappropriate contact with Paryani and no verbal incidents. (Ferro Dep. at 55-56.)

In due course, DOT Human Resources informed Union Chief Steward Mazen Alsabe ("Alsabe") of the allegations. (<u>Id.</u> at ¶ 29.)  Alsabe then spoke to Giglietti and Paryani. (<u>Id.</u>)  Alsabe reported back to Human Resources that Ferro was an antagonist on the crew who participated in sexual conversations and joking. (<u>Id.</u>)  In addition, Ferro was noted for having a violent temper and Giglietti and Paryani stated they were afraid of him. (<u>Id.</u> at ¶¶ 29-30.)

Because of these statements, DOT decided to transfer Ferro to work on a different project – a decision the union agreed with since Ferro did not receive a decrease in pay, benefits or seniority at the new job site. (<u>Id.</u> at ¶¶ 32-35.)  DOT told Ferro on April 26, 2010 that he was being reassigned because they needed additional manpower on a project in Warwick, Rhode Island. (<u>Id.</u> at ¶ 35.)  Ferro was to report to his new post the next day.  Instead, the next day Ferro arrived at the Warren project, where he slashed the tires of Giglietti's state-issued truck and made scratches in the paint along the passenger side. (<u>Id.</u> at ¶¶ 37-44.)  Thereafter, Paryani informed DOT that Ferro was causing trouble on the job site. (<u>Id.</u> at ¶ 40.)  After Ferro left the Warren work site, he twice called Paryani, once calling her a derogatory name and a second time making a comment about Paryani and a male co-worker.  Ferro pleaded <u>nolo</u>

<u>contendere</u> to charges relating to scratching and slashing the tires of Giglietti's truck.[6] (<u>Id.</u> at ¶ 43.)

DOT informed Ferro the next day that he had been placed on administrative leave with pay pending an investigation into what happened at the Warren job site the day before. (<u>Id.</u> at ¶ 45.) Following a disciplinary hearing, on May 27, 2010, Ferro was terminated by the DOT. (<u>Id.</u> at ¶ 48.) Thereafter, he filed a grievance which was ultimately denied in December 2010. (<u>Id.</u> at ¶ 53.) Neither Ferro nor the union appealed the denial of the grievance. During this administrative process, however, another incident occurred. On June 17, 2010, Ferro drove past Giglietti while Giglietti was working on the Warren project and threw a cup of hot coffee out of his window and onto Giglietti. (Ferro Dep. at 74.)

Ferro believes he was targeted because he is a heterosexual.[7] (Ferro Dep. at 38.) Following his termination

---

[6] Ferro's Complaint puts forth a claim for malicious prosecution against Giglietti and the DOT. (Compl. ¶¶ 119-123). Ferro now acknowledges that his <u>nolo contendere</u> plea forecloses any such claim, and thus judgment in the Defendants' favor is proper with respect to Count VIII of the Complaint. (Pl.'s Objection to Defs.' Mot. for Summ. J. 11, ECF 43-1.)

[7] Defendants provide evidence that Ferro has subsequently pursued a variety of legal actions against various employers. Defendants seem to suggest this lawsuit is part of a pattern of behavior by Ferro, whereby after being terminated from a job, he hurls accusations at his former employer. In addition, Defendants provide evidence of prior interpersonal disputes Ferro had with other co-workers at various jobs. Evidence of

from DOT, Plaintiff brought the instant action alleging state and federal law violations.   Ferro alleges that he was subject to hostile work environment sexual harassment due to Giglietti's behavior toward him and that he was inappropriately transferred within the DOT as retaliation for reporting this harassment.   In addition, he seeks individual liability under Rhode Island law against the two individual defendants for aiding and abetting these violations.

Defendants argue that Plaintiff strikes out on all fronts. Specifically, with respect to the hostile work environment claims, Defendants move for summary judgment arguing, <u>inter alia</u>, that Plaintiff has failed to establish that: (1) he is a member of a protected class; (2) he was subject to discrimination based on sex; (3) he was subject to unwanted sexual harassment since he partook in crass humor at the workplace; and (4) the alleged harassment was sufficiently severe and pervasive.   With respect to the retaliation claim, Defendants argue Plaintiff did not suffer an adverse employment consequence, which forecloses his claim.   Finally, Defendants argue Plaintiff failed to properly raise his claim for individual liability under state law.

---

this type was not considered in deciding the instant motion. <u>Cf.</u> <u>Redd v. New York State Div. of Parole</u>, 923 F. Supp. 2d 393, 399-400 (E.D.N.Y. 2013).

II.  Standard of Review

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  When analyzing a motion for summary judgment the court must view evidence in the light most favorable to the non-moving party and must draw all reasonable inferences in the non-moving party's favor.  DeLia v. Verizon Commc'ns Inc., 656 F.3d 1, 3 (1st Cir. 2011).  "A genuine issue of fact exists where the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Taylor v. Am. Chemistry Council, 576 F.3d 16, 24 (1st Cir. 2009) (internal citation and quotation marks omitted).

Summary judgment has a dual nature.  The moving party bears the initial burden of demonstrating a lack of a material issue of fact, which shifts the burden to the non-moving party, who then must show the trier of fact could rule in his favor with respect to each issue.  Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010).  "A properly supported summary judgment motion cannot be defeated by relying upon conclusory allegations, improbable inferences, acrimonious invective, or rank speculation." Ahern v. Shinseki, 629 F.3d 49, 54 (1st Cir. 2010).  "A party who aspires to oppose a summary judgment motion must spell out his arguments squarely

and distinctly, or else forever hold his peace." Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 260 (1st Cir. 1999). "Even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." Meuser v. Fed. Express Corp., 564 F.3d 507, 515 (1st Cir. 2009) (quoting Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)). While questions related to sexual harassment may be fact specific, summary judgment "is an appropriate vehicle for policing the baseline" of those claims. Pomales v. Celulares Telefonica, Inc., 447 F.3d 79, 83 (1st Cir. 2006) (internal citation and quotation marks omitted).

III. Discussion

Title VII prohibits an employer from discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C § 2000e-2(a)(1). Title VII does not protect against discrimination based on sexual orientation. Higgins, 194 F.3d at 259 (describing discrimination on the basis of sexual orientation as a "noxious practice, deserving of censure and opprobrium" but noting that "Title VII does not proscribe harassment simply because of sexual orientation."). During his

11

deposition, Ferro disclaimed a theory of discrimination based on his sex, instead stating that he was discriminated against because of his status as a heterosexual. (Ferro Dep. at 38.) Taking Ferro's statements at face value, they are fatal to his Title VII action, since that statute protects heterosexuals no more than it does homosexuals.[8] Moreover, even if the Court read Ferro's Complaint and deposition testimony as alleging sexual harassment on the basis of "sex," due to Ferro's allegations that the harassment he faced resulted from the individual Defendants' sexual desire for him, the claim would still fail.

Ferro has also brought state law claims. The Rhode Island Fair Employment Practices Act ("FEPA") provides that it is unlawful "[f]or any person, whether or not an employer, employment agency, labor organization, or employee, to aid, abet, incite, compel, or coerce the doing of any act declared by this section to be an unlawful employment practice." R.I. Gen. Laws § 28-5-7(6). Among the employment practices prohibited is discriminating against an employee due to his "race or color, religion, sex, sexual orientation, gender identity or expression, disability, age, or country of ancestral origin." R.I. Gen. Laws § 28-5-7(1). In addition, the Rhode Island Civil

---

[8] Ferro's theory would not be fatal to the state law claims. Rhode Island state law provides protection for discrimination based on sexual orientation. See R.I. Gen. Laws §§ 28-5-7 and 28-5-6(14).

Rights Act ("RICRA") prohibits discrimination on the basis of "race, color, religion, sex, disability, age, or country of ancestral origin."  R.I. Gen. Laws § 42-112-1.

As is routine practice, the Court will analyze the federal and state claims together.[9]  See Rathbun v. Autozone, Inc., 253 F. Supp. 2d 226, 234, 236 (D.R.I. 2003), aff'd, 361 F.3d 62, 71 (1st Cir. 2004) (noting that the Rhode Island Supreme Court routinely analyzes FEPA claims under Title VII and that FEPA and RICRA claims rise and fall together).  Plaintiff seeks to impose liability based on two main allegations: sexual harassment due to a hostile work environment and retaliation for reporting that harassment.

A.   Hostile Work Environment

To succeed on a claim for sexual harassment based on a hostile work environment, a Plaintiff must demonstrate "(1) that [he] is a member of a protected class; (2) that [he] was the subject of unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) that the sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find

---

[9] Plaintiff and Defendants agree with this approach as they briefed these issues together.

it hostile or abusive and the plaintiff perceived it to be so; and (6) that a basis for employer liability has been established." See Barboza v. Town of Tiverton, C.A. No. 07-339-ML, 2010 WL 2231995, at *5 (D.R.I. June 2, 2010).

Courts often remind litigants that Title VII is not a general civility code for the workplace.[10] Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998). Taking the facts in the light most favorable to him, Ferro has succeeded in showing the lack of decorum at the DOT during his brief tenure; he has abjectly failed, however, to show that he was subject to unwelcome sexual harassment that was severe and pervasive – a shortcoming that is fatal to his claims.[11]

Ferro has also failed to raise a triable claim that he was discriminated against based on sex,[12] or that the actions he

---

[10] To a lesser extent, Ferro's claims involve sexual harassment accusations against Paryani. Having not responded to Defendants' opposition in this regard, those claims have been abandoned – and for good reason. Ferro alleges that Paryani discriminated against him based on his heterosexual status because she was homosexual and had a son who was homosexual as well. As previously noted, this is not actionable under Title VII. Higgins, 194 F.3d at 259.

[11] Contrary to the DOT's position, Ferro's status as a man does not preclude him from recovery under Title VII. Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 79 (1998); see also, Perez-Cordero v. Wal-Mart Puerto Rico, Inc., 656 F.3d 19, 28 (1st Cir. 2011).

[12] Ferro claims that Giglietti's sexual desire for him instigated the harassment alleged in his Complaint. The evidence suggests, however, that the two men had a rivalry, and

14

claims to have been offended by were unwelcome.[13]  The Court need

not dwell on either of these issues, however, because it is

clear that Ferro was not subject to severe or pervasive

harassment, and thus his claim fails.

To be actionable, sexual harassment must be severe or

pervasive such that a reasonable person would find it hostile or

abusive.  Harris, 510 U.S. at 21.  Because "[t]here is no

mathematically precise test to determine whether [a plaintiff]

presented sufficient evidence" about the severe and pervasive

hostile work environment they were subjected to, a court must

examine "all the attendant circumstances."  Pomales, 447 F.3d at

---

that Giglietti sought to embarrass Ferro. Ferro readily admits
he thought Giglietti was joking and did not take him seriously
regarding any of the alleged sexual propositions.  (See Ferro
Dep. at 42; 45; 47.)  "Most unfortunately" crass expressions of
sexual desire "are commonplace in certain circles, and more
often than not, when these expressions are used (particularly
when uttered by men speaking to other men), their use has no
connection whatsoever with the sexual acts to which they make
reference."  Johnson v. Hondo, Inc., 125 F.3d 408, 412 (7th Cir.
1997); see also, Kreamer v. Henry's Marine, No. Civ. A. 03-3139,
2004 WL 2297459, at *6 (E.D. La. Oct. 7, 2004) (finding that
defendant's repeated grabbing of plaintiff's crotch was
motivated by desire to humiliate plaintiff rather than sexual
desire).

[13] Sexual harassment must be unwelcome to be actionable.
"[W]illing and frequent involvement" in the type of banter
complained about suggests that the conduct at issue is not
unwelcome or hostile.  Weinsheimer v. Rockwell Int'l Corp., 754
F. Supp. 1559, 1564 (M.D. Fla. 1990) aff'd, 949 F.2d 1162 (11th
Cir. 1991).  It is undisputed that a culture of inappropriate
behavior prevailed at the DOT.  Ferro, while clearly often the
target of animosity from his co-worker, nevertheless partook in
this atmosphere.

83 (alteration in original) (citation omitted). The circumstances to consider are: the frequency of the discriminatory conduct, whether it was physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interfered with the employee's work performance. Id. at 83. "Common sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between simple teasing and roughhousing among members of the same sex, and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 82 (1998). Therefore, this Court must examine the "social impact of the complained-of behavior, applying an appropriate sensitivity to the social context of the workplace relations" between the two men, while recognizing that all inferences must be drawn in favor of the non-moving party. Mann v. Lima, 290 F. Supp. 2d 190, 196 (D.R.I. 2003).

Looking realistically at the social context of an organization such as the DOT, one expects a certain level of salty language and inter-personal rivalry. Ferro acknowledges this himself, explaining that in his experiences in similar organizations employees often direct vulgar comments at one another. Therefore, the Court is mindful of this less-sensitive social context.

16

Here, there is no evidence of the harassment at issue being physically threatening or humiliating.  Instead, Ferro dealt with mere inappropriate utterances.  Ferro never alleges that he felt intimidated by these exchanges, and the undisputed record shows that Ferro's co-workers were in fact physically afraid of him.  Indeed, it was Giglietti who, when engaged in a confrontation with Ferro, backed down.  Later, it was Ferro who hurled a cup of hot coffee at Giglietti from a moving car.  In this case, common sense counsels that the harassment Ferro faced fails to meet the legal requirements.

For the foregoing reasons, summary judgment on counts I through III is appropriate.

B.   Retaliation

Ferro's retaliation claim may be quickly dispatched.  To successfully bring a claim for retaliation, a plaintiff must demonstrate, (1) that he engaged in protected conduct; (2) that he suffered an adverse employment action; and (3) that the adverse employment action was connected to the protected activity. Fantini v. Salem State Coll., 557 F.3d 22, 32 (1st Cir. 2009).

Plaintiff's retaliation claim revolves around his transfer from a DOT project in Warren, Rhode Island to a DOT project in

Warwick, Rhode Island.[14]    This transfer did not result in a
change in pay or seniority, but did add time to Plaintiff's
commute.   According to Plaintiff's theory, part of the reason he
took the job at the DOT was to work closer to home.   Factually,
the record belies this claim.   Ferro admits when he accepted
employment at DOT, he did not know in what town or location he
would be working.    Legally, this claim fails because the
transfer did not constitute an adverse employment action.
Ayala-Sepulveda v. Municipality of San German, 671 F.3d 24, 32
(1st Cir. 2012) (holding transfer to different department was
not adverse employment action where employee's pay, rank and
duties remained the same).

    For the foregoing reason, summary judgment on counts IV
through VI is appropriate.

    C.   Individual Liability Under FEPA

    Ferro's Complaint asserts individual allegations against
Giglietti and Paryani under R.I. Gen. Laws § 28-5-1.   Plaintiff
appears to have meant to bring a cause of action under R.I. Gen.
Laws § 28-5-7(6).   The provision of FEPA at issue provides that
it is unlawful "[f]or any person, whether or not an employer,

---

[14] Ferro's retaliation claim would fare no better if it were
premised on his termination from the DOT.   That termination
occurred after Ferro was arrested and pled nolo contedere to
charges related to vandalizing a DOT truck.   Such a firing
constitutes a legitimate, non-discriminatory reason for Ferro's
termination.   See Barboza, 2010 WL 2231995, at *7.

employment agency, labor organization, or employee, to aid, abet, incite, compel, or coerce the doing of any act declared by this section to be an unlawful employment practice." R.I. Gen. Laws § 28-5-7(6). This Court recently certified a question about whether this statute permits individual liability. See Mancini v. City of Providence, Civil Action No. 13-92 S, 2013 WL 5423717 (D.R.I. Sept. 26, 2013). Were the Rhode Island Supreme Court to find individual liability does exist under the statute, Ferro would still fail to state a claim. Because, as discussed in Section III.A and III.B, no violation of FEPA occurred, the individual defendants cannot be said to have aided, abetted, incited, or compelled a violation of FEPA. This determination does not require waiting for the Rhode Island Supreme Court's determination regarding individual liability.

IV. Conclusion

For the reasons stated above, Defendants' motion for summary judgment is GRANTED.

IT IS SO ORDERED.

_____
William E. Smith
Chief Judge
Date: February 19, 2014

19